MITCHELL et al. v. HITCHMAN COAL & COKE CO.

(Circuit Court of Appeals, Fourth Circuit. May 28, 1914.)

No. 1220.

1. TRADE UNIONS (§ 1*) — LABOR ORGANIZATIONS — LEGALITY — COMMON-LAW RULE.

The ancient English rule that labor unions were unlawful does not prevail in the United States in view of the changed conditions existing; the rule being now settled that labor may organize for its own protection and to further the interests of the laboring classes, and may strike and persuade and induce others to join them by peaceable means, being only subject to legal restraint by injunction when they resort to unlawful means to cause injury to others to whom they have no relation, contractual or otherwise.

[Ed. Note.—For other cases, see Trade Unions, Cent. Dig. § 1; Dec. Dig. § 1.*]

2. ALIENS (§ 4*)—CONSTITUTIONAL LAW (§ 210*)—DISABILITIES—EQUAL PROTECTION OF THE LAWS.

So long as the United States permits aliens to immigrate, a large majority of whom are uneducated laborers, it is the duty of the government to afford them equal protection under our Constitution and the laws pursuant thereto, including the right to combine to improve their condition.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 4; Dec. Dig. § 4;* Constitutional Law, Cent. Dig. §§ 679, 680; Dec. Dig. § 210.*]

3. TRADE UNIONS (§ 1*)—UNITED MINE WORKERS—LEGALITY OF ORGANIZATION.

Code W. Va. 1906, § 413 (Code 1913, c. 15H, § 28 [sec. 487]), provides that no persons or combination of persons, by force, threats, menaces, or intimidation of any kind, shall prevent or attempt to prevent from working in or about any mine any person or persons who have the lawful right to work about the same and who desire to so work, but this provision shall not be so construed as to prevent persons from associating for any lawful purpose or for using moral suasion or lawful argument to induce any one not to work in or about any mine, and section 2859 (Code 1913, c. 62E, § 1 [sec. 3578]) regulates the use of union labels and prohibits the use thereof on merchandise not the product of union labor. *Held*, that

the trade union known as the United Mine Workers of America, organized to secure reasonable wages and better working conditions among the mine workers of the United States and by concentrated effort to compel by peaceable means the improvement of mining conditions in the United States, is not an unlawful organization or combination, either under the statute or at common law.

[Ed. Note.—For other cases, see Trade Unions, Cent. Dig. § 1; Dec. Dig. § 1.*]

**4. CONSPIRACY (§ 3*)—ELEMENTS — EMPLOYÉS — UNIONIZATION — INCREASE OF WAGES.**

Since members of a trade union have a lawful right to induce persons employed in the same general business to join the union in order to secure as high wages as possible, compatible with the successful operation of the business, a combination to accomplish such purposes by peaceable and lawful methods, so long as they refrain from resorting to unlawful measures to effectuate the same, does not constitute a conspiracy.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 3; Dec. Dig. § 3.*]

**5. CONSPIRACY (§ 1*)—WHAT CONSTITUTES.**

A "conspiracy" is a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose or some purpose not in itself criminal or unlawful, by criminal or unlawful means.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 1–5; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 2, pp. 1454–1461; vol. 8, p. 7613.]

**6. CONSPIRACY (§ 19*)—EVIDENCE—THREATS.**

Threats of an organizer employed to induce mine workers to form a local of the United Mine Workers of America, to unionize the employés of complainant's mine or shut it down, he having no authority to carry the threats into execution, were insufficient to show a conspiracy to compel the unionization of the mine by unlawful means.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 25, 26; Dec. Dig. § 19.*]

**7. CONSPIRACY (§ 19*)—INTERFERENCE WITH COMPLAINANT'S BUSINESS—UNIONIZATION OF MINE EMPLOYÉS.**

Evidence reviewed, and *held* insufficient to establish a conspiracy on the part of officers and representatives of a labor union to unionize the employés of complainant's mine by unlawful means.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 25, 26; Dec. Dig. § 19.*]

**8. CONSPIRACY (§ 19*)—EMPLOYÉS—UNIONIZATION—EVIDENCE.**

Where complainant after a strike had severed all business dealings with the United Mine Workers of America and had established a nonunion mine, after which attempts were made to induce complainant's employés to rejoin the union, evidence that, prior to complainant's adoption of the nonunion policy, defendants were engaged in a combination or conspiracy. and by intimidation, violence, and coercion were trying to prevent complainant from operating its mine, was inadmissible to show the existence of an unlawful conspiracy for the same purpose after the open policy was adopted.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 25, 26; Dec. Dig. § 19.*]

**9. EQUITY (§ 427*)—RESTRAINT OF TRADE—ANTI-TRUST LAW—VIOLATION—CONFORMITY TO PLEADINGS.**

. A decree determining that a labor union was an unlawful combination or conspiracy in restraint of trade in violation of the Sherman Anti-Trust

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), could not be sustained where there was no allegation of defendant's violation of such law in the pleadings.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 1001–1014; Dec. Dig. § 427.*]

10. MONOPOLIES (§ 24*)—CONSPIRACY IN RESTRAINT OF TRADE—INJUNCTION—RIGHTS OF PRIVATE PERSONS.

A private person cannot obtain an injunction restraining the continuance of an alleged conspiracy or combination in restraint of interstate commerce under the Sherman Anti-Trust Law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]); the injunctive remedy covered by such act being available to the government only, and the individual being only authorized to sue for and recover threefold damages.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 24.*]

11. MASTER AND SERVANT (§ 339*)—CONTRACT OF EMPLOYMENT—INTERFERENCE BY THIRD PERSON.

Complainant, on employing miners, required them to sign a contract declaring that they were not members of the United Mine Workers of America and would not become so while employés of complainant, which agreed to run its works nonunion, and that if at any time during the employment an employé should become connected with the United Mine Workers of America or any affiliated organization he agreed to withdraw from the employment of the company, etc. *Held*, that such contract did not bind the employés not to join the union, but only provided for termination of the contract in case they did so; and hence solicitation of such employés and inducements held out to them to join the union, by lawful and persuasive methods not coercive nor intimidating, did not constitute an unlawful interference with such contract of employment.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1283; Dec. Dig. § 339.*]

Appeal from the District Court of the United States for the Northern District of West Virginia, at Philippi; Alston G. Dayton, Judge.

Suit by the Hitchman Coal & Coke Company against John Mitchell and others individually to restrain them from attempting to organize complainant's mine workers and to induce them to join a union known as the United Mine Workers of America. From a decree in favor of complainant granting a permanent injunction (202 Fed. 512), defendants appeal. Reversed, with instructions to dismiss.

See, also, 172 Fed. 963; 176 Fed. 549, 100 C. C. A. 137.

Charles E. Hogg, of Point Pleasant, W. Va. (Charles J. Hogg, of Point Pleasant, W. Va., on the brief), for appellants.

Geo. R. E. Gilchrist, of Wheeling, W. Va., for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. The plaintiff corporation presented its bill for injunction October 24, 1907, to the Honorable Alston G. Dayton, United States District Judge, in the Circuit Court for the Northern District of West Virginia, against John Mitchell and nine others, alleging itself to be a corporation under the laws of West Virginia, and the defendants to be citizens and residents of several different states other than West Virginia; that nine of said defendants first named are presidents, vice presidents, and secretary-treasurers,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

respectively, of the United Mine Workers of America, and of the International Union United Mine Workers of America, of District No. 6, United Mine Workers of America, and of subdistrict 5 of District No. 6, United Mine Workers of America, and the defendant Thomas Hughes, an organizing agent of said organization; that plaintiff is the owner of about 5,000 acres of coal, has a mine and mining plant on the Baltimore & Ohio Railroad, that is mining and shipping a daily output of about 1,400 tons of coal, largely under contracts, between 500 and 600 tons to the railroad for its daily engine fuel, has large contracts for future delivery; that prior to April 1, 1906, it operated its mine by employment of men affiliated with the United Mine Workers of America, but on that day a strike was ordered by the officers of the union, and on April 16, 1906, the men so employed, in obedience to the demands and orders of defendants, went out and ceased to work. It is charged that this strike was ordered because certain other operators refused to sign the scale demanded by the union, and so far as plaintiff was concerned it was wholly without justification or excuse because it distinctly agreed to pay the scale price and any increased price fixed thereby from April 1, 1906, the date of the strike order, whenever it might be fixed and agreed upon, with which proposition the miners themselves, whose labor was involved, were entirely satisfied; that notwithstanding this, at the instance of defendants, its mine was shut down from April 16 to June 12, 1906, to its great financial loss and embarrassment by reason of its inability to comply with its existing contracts. The bill then sets forth in detail in effect that on the last-named date in order to be able to run said mine it entered into a contract with its men whereby it agreed with them to run its mining operation wholly upon nonunion basis, refusing absolutely to employ any union men, and whereby the men on their part agreed not to join or become members of this union and to work for plaintiff as nonunion men; that plaintiff has since that time been running its mine under this contract with its men to the entire satisfaction of both, paying its men as high wages as paid in any of the union mines. It then charges the officers and agents of the union, with full knowledge of the existence of this contract, to have repeatedly sought to have plaintiff violate it and agree to reunionize its mine, which plaintiff has refused to do, whereupon such union officers and agents are seeking by inducements, threats, and intimidation, to induce plaintiff's employés, bound by said contract with it, to leave its service, break their contract, join the union, and also to prevent other men from engaging in its employ, and this, it is charged, with the unlawful purpose to prevent any but union men to work in its mine, compel it to employ none but union men and to submit its business and its property to the jurisdiction and control of said union and its officers. The bill then proceeds to charge the United Mine Workers of America and its subordinate organizations to be unincorporated organizations, having unlawful purposes and designs to create a monopoly and trust in coal mining labor, and in support of these allegations sets forth in extenso what purports to be excerpts from the constitutions and by-laws of the supreme and subordinate unions, together with the obligation required to be taken by its members and ex-

tracts from the proceedings of its national conventions. A distinct conspiracy on the part of defendants as individuals is charged to secure, by reason of their positions as officers of this union, the abandonment by the men of their contract with plaintiff, their joining the union, the inability of plaintiff to employ others, and the entire shutting down of its mine to its irreparable loss and injury.

The answer contains a general denial, which is substantially as follows:

That the United Mine Workers of America and its subordinate associations or branches, by its officers, agents, employés, and servants, have sought, and are seeking, by inducements, threats, and intimidation, but without physical force, "to cause plaintiff's employés to leave its service and to cause others who have engaged to enter its service to break their engagements of service and not to work for plaintiff, and to prevent others from working for plaintiff, and all with the avowed and actual purpose of compelling plaintiff to recognize said organization, and to force plaintiff to employ none but persons who are members of the United Mine Workers of America."

They deny that any of the expressed objects of the United Mine Workers of America are unlawful.

They deny that the appellants have entered into a combination or conspiracy under the name of the United Mine Workers of America, unlawfully to persuade, entice, and procure appellee's employés to break, violate, and disregard their several contracts with the appellee, with the avowed purpose of compelling appellee to reunionize its plant without its consent, and deny that they have formed a conspiracy to compel, by threats and intimidation, appellee's employés to join said union.

They deny that Zelenka reported, and caused this report to be circulated among appellee's employés, that Zelenka, Green, and Watkins (appellants), after a conference with appellee's general manager, had agreed with such general manager that appellee's employés were allowed to join the United Mine Workers of America, and deny that they caused the further statement to be circulated among said employés that they must join the union, or else they would be out of a job at an early day; and deny that they caused to be circulated a statement that only union men would be permitted to work at appellee's mine, and that those of appellee's employés who did not join the union would not be permitted to get a job any place else.

And they deny that the appellants are endeavoring to unionize the appellee's mine, and that they threaten to close down appellee's mine and keep it closed until appellee agrees to sign the scale and employ none but union labor; and they deny that the national organization of the United Mine Workers of America and its district and subdistrict organizations are under their constitutions violating either the common or statutory law of the state of West Virginia.

And they deny that the appellants will, unless enjoined, by enticement, persuasion, or coercion, bring about the shutting down of appellee's mine and the ultimate destruction of its business; and deny that they will compel the appellee to recognize the appellants as members of

214 F.—44

said labor organization, and will compel appellee to contract with its employés through appellants as officers of said organization; and they deny that they are about to indulge in any of the methods of accomplishing their purpose by the use of threats, intimidation, and other unlawful means alleged in said bill.

Presented with this bill were some 28 affidavits in support of its allegations. A temporary restraining order was granted until the next regular term of court to be held at Parkersburg, January 14, 1908, for which date plaintiff's motion for a temporary injunction was set down for hearing. This hearing, on motion of defendants, was continued until May 26, 1908, when plaintiff presented more than 20 additional affidavits and argued its motion for temporary injunction; counsel for defense stating they "did not desire to be heard in opposition to said motion so far as the granting of a temporary injunction at the time was concerned and not consenting but objecting thereto." The temporary injunction was on that day granted in exact accord with the terms of the restraining order.

Answers were filed, exceptions entered thereto, motions as to certain unserved defendants to have said bill dismissed as to them were made, and a motion by defendants, disclaiming "any intention of conceding the truth of the allegations of the plaintiff's bill whereby fraud, coercion, and intimidation or violence in any form whatsoever is imputed to them," was made to dissolve the injunction, "on the face of the bill and exhibits," in so far as said injunction restrained said defendants or any of them from the use of argument, reason, and persuasion, to induce the employés of the plaintiff or any of them to become members of the United Mine Workers of America or any of its subordinate branches; so far as it restrained them from interfering or talking to any person or persons in the employment of the plaintiff, or about to enter the employment of the plaintiff, for the purpose of inducing such persons to become members of the United Mine Workers of America or any of its subordinate branches, in a peaceable and law-abiding manner and unaccompanied by intimidation, force, fraud, violence, or coercion; also in so far as it restrained defendants from visiting the homes of plaintiff's employés for the purpose of inducing them by reason, persuasion, and argument, unaccompanied by force, fraud, intimidation, violence, or coercion, to become members of the United Mine Workers of America or any of its subordinate branches; in so far as it restrained defendants from going near the premises of plaintiff for the purpose of talking with or inducing the employés of plaintiff to become members of the United Mine Workers of America; in so far as it restrained from unionizing or attempting to do so plaintiff's mine, if by "unionizing" is meant action on the part of defendants to induce the employés of plaintiff to become members of the United Mine Workers of America by the use of argument, persuasion, and reason unaccompanied by force, violence, coercion, or intimidation; and also in so far as it restrained defendants from interfering with plaintiff's employés if by the term "interfering" is meant that defendants shall be precluded from interviewing and visiting plaintiff's em-

ployés for the purpose of inducing them to become members of the union.

This motion was deferred until further orders from the court, and on the 21st day of September, 1909, the court filed an opinion in which it held, among other things, that the defendants were not entitled to have the injunction modified, and a decree in pursuance thereof was entered on the 6th day of October, 1909, from which an appeal was taken to this court, and same was dismissed for want of jurisdiction. 176 Fed. 549, 100 C. C. A. 137.

On the 23d day of December, 1912, the court filed another opinion, and in pursuance thereof entered a final decree perpetuating the injunction theretofore granted, from which defendants took an appeal to this court.

The final decree entered herein was based upon the assumption that there was a conspiracy on the part of the defendants to unionize the plaintiff's mine without its consent, and to bring about the breaking of the contracts existing between the plaintiff and its employés, as well as to secure the breaking of the contract between appellee and its employés which had thereafter been entered into; also, to induce the employés to leave its service. These acts are inhibited by the injunction.

The injunction inhibits the defendants from combining, conspiring, or attempting to interfere with appellee's employés, so as willfully to bring about the breaking of their contracts of service with the appellee which appellee now has with its employés; from hindering or obstructing any of the business of appellee, its agents, servants, or employés in the discharge of their duties, or in any manner obstructing appellee's business, with the purpose of compelling or inducing, by threats, intimidation, violence, violent or abusive language, or persuasion, any of the employés of the appellee to refuse or fail to perform their duties as such employés; from compelling or inducing or attempting to compel or induce, by threats, intimidation, force, or violence, or abusive or violent language, any of the employés of plaintiff to leave its service, or refuse to perform their duties as such employés; or in such manner to prevent others seeking employment from accepting employment with the appellee; from entering or establishing a picket or pickets of men on, or patrolling the railroad or street cars' passing through or adjacent to, appellee's property, for the purpose of inducing or compelling, by threats, intimidation, violence, violent or abusive language, or persuasion, any employé of plaintiff to fail or refuse to perform his duties, or for the purpose of interfering or talking to any person or persons on said railroad or street cars going to appellee's mine to accept employment with appellee, for the purpose and with the intention of inducing or compelling them, by threats, violence, intimidation, violent or abusive language, or in any manner whatsoever, to refuse or fail to accept service with appellee, from congregating at or near the premises of the appellee, and from picketing or patrolling said premises for the purpose of intimidating appellee's employés, or coercing them by threats, intimidation, violence, abusive or violent language, or preventing them from rendering their service to appellee, and in like manner from inducing or coercing them to leave the employment

of appellee, and from in any manner so interfering with appellee in carrying on its business in its usual and ordinary way, and from interfering by threats, intimidation, or violence, or violent and abusive language, with any person or persons who may be employed or seeking employment by appellee, in appellee's mine and works; from either singly, or in combination with others, congregating in and about the approaches to appellee's mine and works for the purpose of picketing or patrolling or guarding the streets or approaches to appellee's mine, for the purpose of intimidating, threatening, or coercing any of appellee's employés from working in its mine or works, or any person seeking employment there from entering into such employment, and from so interfering with said employés in going to and from their daily work in and about the mine and works of appellee; and, finally, from either singly or collectively going to the houses or boarding houses of appellee's employés, or any of them, for the purpose of intimidating or coercing any or all of them to leave the appellee's employment.

It will be observed that the injunction was based upon the finding that the defendants had resorted to the use of force, violence, intimidation, abusive and violent language, and coercion as a means of obtaining membership in the United Mine Workers of America, from the appellee's employés, and also for the purpose of having these employés quit the service of the appellee, or by such means preventing others seeking employment with it from accepting its service as employés.

The appellee will hereinafter be referred to as "plaintiff," and the appellants as "defendants"; such being the relative positions the parties occupied in the court below.

The facts are substantially as follows:

The Hitchman Coal & Coke Company was organized under the laws of the state of West Virginia, in the year 1901, and began operations at Benwood, Ohio county, W. Va., in the early summer of that year. The opening up of the mine consumed some time, and the actual mining of coal did not commence until in the winter of 1902. At that time, however, the company did not ship any coal. The company began its operations upon a nonunion basis; that is, it employed its labor independently of and without relation to the organization known as the United Mine Workers of America.

It appears from the testimony of E. T. Hitchman that, previous to its entering upon the operation of mining coal at Benwood, the Hitchman Company entered into a contract with the Baltimore & Ohio Railroad Company; and during the early part of its operations all the coal mined by the company was delivered upon the engines of the railroad company; the amount mined at first was very small; it practically commenced at nothing and gradually increased, until now this mine is a regular coaling station for the railroad company, and is its only coaling station in the vicinity of Benwood.

The coal company continued to operate its mine upon a nonunion basis until the month of April, 1903, when it entered into a contract with its employés through the officers of the United Mine Workers of America, adopting the scale of wages demanded by the members of

that organization, and agreeing to observe the rules and conditions of employment.

The company operated its mine upon what is known as a "union basis," for three years, or until some time in April, 1906. The first contract or agreement expired in 1904, and was renewed for a period of two years, or until April, 1906. At that time the men refused to work longer because no agreement could be made between the employés and the company as to the rate of wages and conditions of employment.

About June 21, 1906, after the mine had been shut down and operations suspended for a period of about 50 days, the company resumed operations upon a nonunion basis, with the understanding between the officials of the company and its employés that the company would deal with each one of them individually from that time on, and that the men who had formerly been in the employ of the company were informed by its president that each man would have to seek employment for himself, and that the company would have no further relations with the organization known as the United Mine Workers of America.

After resuming operations in June, 1906, it was agreed between the company and its employés that the company's mine would be operated upon a nonunion basis. Its board of directors passed a resolution whereby a fixed policy was adopted by the company to employ none but nonunion laborers. The agreement of employment between the company and its men was verbal up to January, 1908, but about that time and since the institution of this suit the company issued employment cards, the exact language of which will be hereinafter quoted and referred to.

Thereafter, each and every man who entered the company's employment was required to sign one of the cards in question before being accepted as an employé; and any applicant for employment who refused to sign the card was denied employment.

It appears from the testimony of R. J. Cotts, an employé of the Hitchman Coal & Coke Company, that from and after June, 1906, up to and including the date of the taking of the testimony herein, the Hitchman Coal & Coke Company continued to operate its mine upon a nonunion basis, with an understanding or agreement between it and its employés that the company would employ none but men who were not members of the United Mine Workers of America; and from January 1, 1908, the men on their part agreed that they would not become members of the United Mine Workers of America so long as they continued in the employment of that company.

During all this time, from the early part of 1902 up to the time of the taking of testimony on behalf of the plaintiff in this case, the business of the Hitchman Coal & Coke Company has increased naturally and gradually, from a production and sale of about 17,000 tons of coal in 1902, to a production and sale of more than 281,000 tons for the first eleven months of the year 1910.

In the year 1902, all but about 800 tons of the coal produced by the Hitchman Company was sold to the Baltimore & Ohio Railroad Company, and delivered upon its engines at Benwood, W. Va..; while in

1910 more than half of the coal produced was sold in the open market and was designated upon the books of the coal company as "commercial coal" as distinguished from "engine coal"; and nearly all of this "commercial coal" was shipped to ports on the Great Lakes for transportation by vessel to the northwest country, for delivery at ports on Lake Superior.

Witness Cotts further testified that during all these years the prices received by the coal company for both "commercial coal" and "engine coal" would average from 95 cents to $1 a ton; but, during the time of the strike in the anthracite fields during the year 1903, the price for "commercial coal," prior to April 1 of that year, was about $3 a . ton, and also during this time, at the average price of from 95 cents to $1 a ton, the average profit derived by the coal company from the mining and shipping and selling of coal was 25 cents a ton.

It also appears from the testimony of W. H. Koch, manager of the Hitchman Coal & Coke Company, that during the summer of 1907 the officials at that time in charge of the affairs of the United Mine Workers of America for the district in which the Hitchman Company's mine is located called upon the officers of the coal company, and discussed with them the renewal of the relations which had theretofore existed between that company and the miner's organization. At each of these meetings, at least one of which was held in the company's office, the officers of the company refused to consider the renewal of their former relations to the union, and the representatives of the United Mine Workers were informed that it was the fixed and determined policy of that company to employ none but miners who were not members of the union, and in September, 1907, about six weeks after the visit of the officials as above stated, Thomas Hughes, a representative of the United Mine Workers, visited Benwood and its vicinity in an attempt to induce the miners employed by the Hitchman and other coal companies operating in that community to become members of the United Mine Workers.

Witness Koch further testified that in his work as organizer, of soliciting and securing miners to become members of the union, Hughes talked to the employés of the Hitchman and other companies upon the streets of Benwood, and, according to Wesley Corns' testimony, visited the men at their homes, and it is shown by E. C. Pickett's testimony that Hughes addressed the men in open meetings, and talked with one or more of the officers of the coal company as to the reason why that company refused to employ any but nonunion labor.

E. C. Pickett also testified that in an open air meeting, which was attended by the superintendent of the coal company, Hughes simply argued to the men the advantages to be derived from the membership in the United Mine Workers of America.

It further appears from E. C. Pickett's testimony that, as a result of the efforts of Hughes, about 20 or 25 men employed by the Glendale Coal Company, a separate corporation, but managed from the same office and by the same men in charge of the operations of the Hitchman Company, were induced to become members of the United Mine Workers, and the next morning they were discharged by the su-

perintendent of the Hitchman Company. This was in the latter part of September or the first of October, 1907.

We fully appreciate the important bearing the questions here presented have upon the welfare of the mine owners, as well as the laboring men, and are not unmindful of the delicate issues raised by the pleadings and proof in this cause.

That it is advisable to secure a just and fair solution of the labor problem by which equal protection to capital and labor may be secured. is undoubtedly the wish of every patriotic citizen regardless of his station in life. That one who toils for his living is justified in employing all lawful methods for the preservation of his right as an American citizen to secure fair remuneration for his services is established by the federal and the state courts. That such a person also has the right to join with others similarly situated, in order to promote their welfare as a class, is also established as the law of this country. But while this is so, it is equally well settled that the mine owner is entitled to the full protection of the law in the conduct of his business and the enjoyment of his property.

It is insisted by counsel that the defendants as members of the organization known as the United Mine Workers of America have been within their rights as to the transactions referred to in the bill, and that they have not resorted to intimidation, violence, or other unlawful methods, but, on the other hand, have been actuated solely by a desire to promote the general welfare of those who are employed as laborers in the various coal mines of the country, and that they have not at any time attempted to unionize plaintiff's mine as alleged in the bill.

The plaintiff insists that it has the right to employ only nonunion labor, and that the conduct of the defendants in attempting to unionize this class of labor in the state of West Virginia is unlawful in that it is a violation of the Constitution, the common law, and the statute law of that state.

The defendants insist that the policy adopted by the plaintiff is calculated to place those who seek employment of this kind at. a great disadvantage; that it will prevent them from accomplishing by united effort that which is essential to the welfare of those whose only asset is their ability to earn a living by manual labor; and that the action of the plaintiff in this instance in making an indirect attack upon their organization is such as to justify this class of laboring men in employing all lawful methods for the purpose of maintaining their organization, the only means by which they can protect their rights and promote their welfare.

It has heretofore been conceded, as a general rule, that a labor union may employ. peaceable and persuasive methods for the purpose of keeping its organization intact, and thus enable it to care for those in distress, secure as high wages as possible, and, by united effort, secure the enactment of laws requiring the proper equipment of mines so as to render them safe and sanitary, and to do other things calculated to improve the conditions under which they labor, but the decree in this instance somewhat modifies this rule. ·

The most important and far-reaching question is raised by the assignment of error wherein it is insisted that the court below erred in holding that the United Mine Workers of America and its subordinate branches constitute an unlawful organization under the Constitution, the common law, and the statutory law of the state of West Virginia.

The learned judge who granted the injunction in this instance filed a very able and exhaustive opinion ([D. C.] 202 Fed. 512), in which it is held, among other things, that the United Mine Workers of America is an unlawful combination at common law, which he insists is still in full force in that state, and in support thereof cites many English cases.

In disposing of this case the court, among others things, said:

"For common-law conspiracy a number of the members of the trades unions were prosecuted for combining to raise wages and for other of their declared purposes, and convictions were had."

The court further said:

"Such parts of the common law and of the laws of the state of Virginia as are in force within the boundaries of the state of West Virginia when this Constitution (referring to the first Constitution adopted by the state prior to its admission into the Union) goes into operation, and are not repugnant thereto, shall be and continue the law of this state until altered or repealed by the Legislature."

Taking this as a basis, the learned judge insists that the common law under which labor organizations have been declared unlawful in England is still in force in West Virginia, and that therefore this organization is unlawful, unless by statutory enactment the common law has been modified or abrogated to such an extent as to allow an organization of this kind to exist in that state.

[1] We do not deem it profitable to enter into an extended discussion of this phase of the question, believing as we do that, while there are decisions at common law by the courts of England in support of the contention that labor unions are unlawful, yet such rule has not prevailed in this country, except in a few of the earlier decisions of our courts. Even in England combinations of this character were only proceeded against, as a general rule, when they were criminal or prohibited by statutory law.

1 Eddy on Combinations, §§ 404, 405, in referring to this question, says:

"There seems to have been no rule of the common law against combinations of workingmen, except where such combinations were either of a criminal character or directly against some statutory provision.

"There are some dicta to the effect that such combinations would be unlawful, and 'some traces may be found in the ancient books of a doctrine that it is criminal for one man, independently of a combination, to oblige another, by bond or otherwise, to abstain from the exercise of his proper craft or employment.' But even such bond has no direct relation to a combination; its legality or illegality rests upon considerations entirely foreign to those which control the validity of a combination.

"It is stated by an eminent authority that no case was ever cited prior to the year 1825, in which any person was convicted for a conspiracy in restraint of trade at common law for having combined with others for the raising of wages."

The following from Wright's Criminal Conspiracy is a note to the text under section 404:

"The text-books, down to at least 1800, appear to be silent as to the existence of any doctrine of the criminality at common law of combinations of masters of workmen. Neither in the earlier editions of Hawkins nor in East does the doctrine in question appear to be stated. So in the edition of Burn's Justice of 1810, it is not mentioned under the title 'conspiracy,' and under the title 'servants' there are several statements of the statutes against combinations, but there is no reference to common law. The various acts against combinations for controlling masters or workmen which were passed in the eighteenth century (1725, 12 Geo. I, c. 34, extended by 1729, 22 Geo. II, c. 27, § 12; 1799, 39 Geo. III, c. 81; [1800] 39 & 40 Geo. III, c. 106, etc.), commence by declaring or enacting agreements for such purposes theretofore made to be 'illegal, null and void,' which would not have been necessary if they had been thought to be criminal at common law; and they then proceeded by independent enactment to make it punishable in the future to engage in them.

"The result of the whole appears to be that there is not sufficient authority for concluding that before the close of the eighteenth century there was supposed to be any rule of common law that combinations for controlling masters or workmen were criminal, except where the combination was for some purpose punishable under a statute expressly directed against such combinations, or was for conduct punishable independently of combination."

However, assuming it to be true that at the time the common law was incorporated as a part of the law of West Virginia, labor unions formed for the purpose of securing a higher rate of wages were held at common law by the English courts to be a criminal conspiracy, yet we do not consider the same as now binding upon our courts, in view of the changed conditions in this, as well as other, countries, incident to industrial development.

In the case of Everett Waddey Co. v. Typographical Union, 105 Va. 188, 53 S. E. 273, 5 L. R. A. (N. S.) 792, 8 Ann. Cas. 798, the Supreme Court of that state said:

"It is now well settled by the decisions of the courts of the United States and of the highest courts of a majority of the states in the Union that labor may organize as capital does for its own protection and to further the interest of the laboring class. They may 'strike' and persuade and induce others to join them, but when they resort to unlawful means to cause injury to others, to whom they have no relation, contractual or otherwise, the limit permitted by law is passed and they may be restrained. Gray v. Trades Council, 91 Minn. 171, 97 N. W. 663, 63 L. R. A. 753, 103 Am. St. Rep. 477, 1 Ann. Cas. 172, and cases there cited; Murdock v. Walker, 152 Pa. 595, 25 Atl. 492, 34 Am. St. Rep. 678; Otis Steel Co. v. Local Union No. 218, 110 Fed. [C. C.] 700; Consol. S. & W. Co. v. Murray [C. C.] 80 Fed. 811; Union Pac. R. Co. v. Reuf [C. C.] 120 Fed. 102; Allis-Chalmers Co. v. Lodge [C. C.] 111 Fed. 264; Beck v. Railway Union, 118 Mich. 487, 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421; Plant v. Woods, 176 Mass. 492, 57 N. E. 1011, 51 L. R. A. 339, 79 Am. St. Rep. 330; Eddy on Comb. vol. 2, §§ 1031, 1035; Beach on Mono. & Indus. Trusts, §§ 98, 100, 102; Tiedeman on St. & Fed. Control of Persons & Property, vol. 1, § 114.

"In many of the states of the Union there are statutes which provide for the incorporation of trades unions and other labor organizations, and in all of them one of the permissible objects of incorporation is declared to be the securement of better terms of employment; while at common law, as interpreted by the English decisions and a few of the earliest decisions of the courts in this country, labor combinations formed for the purpose of controlling the rate of wages were regarded as a criminal conspiracy. But these early decisions of the courts of this country were soon departed from by other cases, notably in Massachusetts, New York, and Pennsylvania, which

placed labor combinations upon a plane of legal equality with capitalistic combinations, by holding that it was not a criminal conspiracy for workmen to combine for the purpose of enhancing the rate of wages, or for improving, in any other way, their relations with employers."

Also in the case of Carew v. Rutherford, 106 Mass. 14, 8 Am. Rep. 287, the court in discussing this question said:

" * * * And it is no crime for any number of persons, without an unlawful object in view, to associate themselves together and agree that they will not work for or deal with certain men or classes of men, or work under a certain price, or without certain conditions. Commonwealth v. Hunt, 4 Metc. 111 [38 Am. Dec. 346]; Boston Glass Manufactory v. Binney, 4 Pick. 425; Bowen v. Matheson, 14 Allen, 499.

"This freedom of labor and business has not always existed. When our ancestors came here, many branches of labor and business were hampered by legal restrictions created by English statutes; and it was a long time before the community fully understood the importance of freedom in this respect. Some of our early legislation is of this character. One of the colonial acts, entitled 'An act against oppression,' punished by fine and imprisonment such indisposed persons as may take the liberty to oppress and wrong their neighbors by taking excessive wages for their work, or unreasonable prices for merchandises or other necessary commodity as may pass from man to man. Anc. Chart. 172. Another required artificers, or handcraftmen meet to labor, to work by the day for their neighbors, in mowing, reaping of corn, and the inning thereof. Id. 210. Another act regulated the price of bread. Id. 752. Some of our town records show that, under the power to make by-laws, the towns fixed the prices of labor, provisions, and several articles of merchandise, as late as the time of the Revolutionary War. But experience and increasing intelligence led to the abolition of all such restrictions, and to the establishment of freedom for all branches of labor and business; and all persons who have been born and educated here, and are obliged to begin life without property, know that freedom to choose their own occupation and to make their own contracts not only elevates their condition, but secures to skill and industry and economy their appropriate advantages."

The growth and development of the common law occurred when property rights were recognized as paramount to personal rights. At that time there was little, if any, concert of action on the part of the laboring people, owing to their helpless condition, due in the main to their ignorance. Their domination by the landowner and capitalist was absolute in most respects, and as a result they were as helpless as those held in slavery before our great war. Under such circumstances, it is no wonder that we have many decisions in the past at common law, as well as the enactment of statutory laws, by virtue of which it was almost a physical impossibility for those who earned their living by honest toil to accomplish, by organized effort, those things necessary to elevate them to a plane where they could assert those rights so essential to their welfare.

The industrial development of the world within the last half century has been such as to render it necessary for the courts to take a broader and more comprehensive view than formerly of questions pertaining to the relation that capital sustains to labor.

The first syllabus in the case of Powell v. Sims, 5 W. Va. 1, 13 Am. Rep. 629, is in the following language:

"The common law of England is in force in this state only so far as it is in harmony with its institutions, and its principles applicable to the state of the country and the condition of society."

The following cases are to the same effect: Baylor v. Baltimore & Ohio Railroad Co., 9 W. Va., 270; Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331; Tunstall v. Christian, 80 Va. 1, 56 Am. Rep. 581.

In view of the industrial changes indicated, many great problems are now presented to the courts that were wholly unknown at the time when many of the cases relied upon by plaintiff were decided. It is now recognized by all civilized countries that labor is the basis of all wealth, and without which it is utterly impossible to accomplish anything in the industrial world, and, such being the case, the laboring man is entitled to the fullest protection in the assertion of his right to demand adequate pay for any labor that he may perform.

[2] Foreign immigration is increasing rapidly. Statistics show that over a million foreigners land on our shores annually, a majority of whom, owing to their former environments, are not capable of understanding and appreciating what it means to be an American citizen. A large percentage of this class of workmen are employed as miners. While we have no comment to make as to the advisability of restricting immigration (that being a matter which rests solely with the legislative branch of our government), yet we cannot shut our eyes to the conditions that exist as a result of this policy. That this class of labor, a vast number of whom are unable to read and write or understand our language, can secure a more substantial recognition of their rights as members of a labor union is undoubtedly true, and so long as these people are among us for the purpose of earning a living and thereby improving their condition, and at the same time adding to the wealth of our country, it is the duty of this government to afford them equal protection under our Constitution and the laws passed in pursuance thereof. That there is at this time a well-defined struggle between capital and labor, each trying to protect its rights from its own point of view, is a condition and not a theory.

In this connection it is pertinent to consider the purposes of the United Mine Workers of America, which is composed of three branches, to wit, National, District, and Subdistrict, all of which were declared to be unlawful by the lower court. In the preamble of the National Constitution of the organization is to be found a declaration of the purposes for which it was established, which is as follows:

"There is no fact more generally known, or more widely believed, than that without coal there would not have been any such grand achievements, privileges and blessings as those which characterize the twentieth century civilization, and believing as we do, that those whose lot it is to daily toil in the recesses of the earth, mining and putting out coal which makes these blessings possible, are entitled to a fair and equitable share of the same; therefore we have formed 'The United Mine Workers of America,' for the purpose of the more readily securing the object sought by educating all mine workers in America to realize the necessity of union of action and purpose, in demanding and securing by lawful means the just fruits of our toil. And we hereby declare to the world that our objects are:

"First—To secure an earning fully compatible with the dangers of our calling and the labor performed.

"Second—To establish as speedily as possible, and forever, our right to receive pay, for labor performed, in lawful money, and to rid ourselves of the

iniquitous system of spending our money wherever our employers see fit to designate.

"Third—To secure the introduction of any and all well defined and established appliances for the preservation of life, health and limbs of all mine employés.

"Fourth—To reduce to the lowest possible minimum the awful catastrophes which have been sweeping our fellow-craftmen to untimely graves by the thousands; by securing legislation looking to the most perfect system of ventilation, drainage, etc.

"Fifth—To enforce existing laws; and where none exist, enact and enforce them; calling for a plentiful supply of suitable timber for supporting the roof, pillars, etc., and to have all working places rendered as free from water and impure air and poisonous gases as possible.

"Sixth—To uncompromisingly demand that eight hours shall constitute a day's work, and that not more than eight hours shall be worked in any one day by any mine worker. The very nature of our employment, shut out from the sunlight and impure air, working by the aid of artificial light (in no instance to exceed one candle power), would in itself, strongly indicate that, of all men, a coal miner has the most righteous claim to an eight-hour day.

"Seventh—To provide for the education of our children by laws prohibiting their employment until they have attained a reasonably satisfactory education, and in every case until they have attained fourteen years of age.

"Eighth—To abrogate all laws which enable coal operators to cheat the miners, and to substitute laws which will enable the miner, under the protection and majesty of the state, to have his coal properly weighed or measured, as the case may be.

"Ninth—To secure by legislation, weekly payments in lawful money.

"Tenth—To render it impossible, by legislative enactment in every state, for coal operators or corporations to employ Pinkerton detectives or guards, or other forces (except the ordinary forces of the state) to take armed possession of the mines in case of strikes or lockouts.

"Eleventh—To use all honorable means to maintain peace between ourselves and employers; adjusting all differences, so far as possible by arbitration and conciliation, that strikes may become unnecessary."

The constitution of District 6 contains the same declarations of purposes, with the following added:

"Twelfth—And to use all honorable means to elect members of our organization to legislate and enforce laws in state and national legislative assemblies that will bear equally upon all citizens of the United States, its territories and other dominions.

"And we further declare it to be the purpose of District 6, United Mine Workers of America, to give moral and material aid to all its members in good standing and to those who may be dependent upon them, and to render such assistance as may be possible to all our members socially and financially, and to create a relief fund for members in distress, subject to the discretion of the officers and executive board of District 6, United Mine Workers of America, as hereinafter provided."

The court below in its opinion referred to a number of provisions contained in the constitution and rules of this organization which in its judgment rendered the same unlawful; the first being that a member is required to promise that he will cease to work whenever called upon to do so by the organization.

A careful examination of this provision fails to show on its face anything unlawful, while on the other hand common experience teaches us that a rule of this character is essential for the preservation of labor organizations. Without a provision of this kind, there would be no power of securing concert of action; no means by which united effort

could be secured for the accomplishment of the aims and purposes of the organization. In the absence of proof to the contrary, it must be assumed that this power would be exercised wisely, and only when necessary to promote the interest of the organization in a legitimate manner. It would be inconsistent with reason to assume that this power would be exercised so as to prevent the operation of a mine, which would necessarily defeat the very object for which this organization was established, to wit, the procurement of steady employment at remunerative wages.

The court below was also of the opinion that under the rules of the organization a member could be held as a slave, and thus prevented from exercising his own free will. We fail to find any provision preventing one from ceasing to work at any time he may desire, and, if he should do so, he would no longer be a member of the organization. One could also cease to be a member of the union by failing to pay his dues. Under these circumstances there is no possibility of one's being held as a member of the union contrary to his wishes.

The court below was further of the opinion that the union has the power to cause miners to become members thereof. We fail to find anything in the rules to justify the assumption that the union has an arbitrary power, by violence, intimidation or otherwise, to compel one to become a member of the organization. While it is alleged in the bill that the United Mine Workers of America is a secret, voluntary organization, this allegation is not only denied by the answer, but is shown to be incorrect by at least three witnesses, who testified that they were familiar with the organization and its workings, that it is not a secret organization in the ordinary acceptation of the term.

Witness Savage, secretary-treasurer of District No. 6, United Mine Workers of America, among other things, testified that:

"The United Mine Workers of America was established and organized in 1890, at Indianapolis, Indiana, but the first ground work was laid at Columbus, Ohio; it is an open organization."

Witness Lewis, president of the United Mine Workers of America since 1908, and from April 1, 1900, until March 31, 1908, vice president of the United Mine Workers of America, testified, among other things, that:

"There is nothing secret about the United Mine Workers, as was stated by Mr. McKinley. The only thing as to which there is any secret is what is called a joint meeting, when there is a joint scale committee meeting; then the operators request that the representatives of the press be kept out. That is for the purpose of keeping the representatives of the press from knowing their inside business. A stenographer takes the proceedings of the district and national conventions, and they are published; records of the meetings of the local unions are kept by the secretary; and any person who is interested who desires may go and examine the records of a local union."

Witness Sullivan, who was serving his second year as president of District 6, United Mine Workers of America, testified as follows:

"The United Mine Workers has always been an open organization; any one is at liberty to enter the conventions or local meetings who desires; its literature is for the public as well as for the members; there is nothing connected with it that is sought to be withheld from the public."

The court below was also of the opinion that the rules of the organization undertake to "control or rather abrogate and destroy the right of the employer to contract with the men independent of the organization." If it is meant by this statement that under the rules it is possible by peaceable, persuasive, and other lawful methods to induce a majority, if not all, of the miners of any particular locality to join the union and thereby place the mine owner in a position where it may be necessary for him to negotiate with union labor in order to operate his mines, then the conclusion reached by the court below is entirely correct. However, the fact that such a result would be possible under this rule could not in any way affect the legality of the organization, because it has been repeatedly held by the courts that a labor union may use all lawful methods for the purpose of inducing others to join its order, and, until the contrary is shown, it must be assumed that only lawful methods are to be employed for the accomplishment of such purpose.

In the case of My Maryland Lodge v. Adt, 100 Md. 238, 249, 59 Atl. 721, 723, 68 L. R. A. 752–757, the court said:

"* * * They may even use persuasion to have others join their organization. They have an unquestionable right to present their cause to the public in newspapers or circulars in a peaceable way, but with no attempt at coercion. If ruin to the employer results from their peaceable assertion of these rights, it is a damage without remedy."

To the same effect is the case of Beck v. Railway, etc., Union, 118 Mich. 497, 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421.

Another ground relied upon by the court below is that the organization assumes the right through its officers, (1) to control the employer's business, (2) to shut down his mine by calling out men in obedience to their obligation whenever it is deemed to be to the interest of the union, regardless of the employer's interest, or the effect that such act may have upon him as regards loss, damage, or necessary violation, on account thereof, of his existing contracts with others.

Relative to this question the witness McKinley, a member of the plaintiff organization, testified, among other things, that it was the desire of the union, as he understood it, to have every employé in and about the bituminous coal mines of the United States and Canada, as well as the anthracite mines, a member of the United Mine Workers of America. It is admitted to be the purpose of this organization to induce all miners to join the union, and, until the contrary is shown, it must be inferred that only lawful methods are to be employed by it for that purpose.

Witness Lewis also testified that:

"It is not now, and never has been, the policy of the United Mine Workers' organization to use force or coercion or any unlawful methods to promote its jurisdiction or the growth of the organization, and the moment they attempt to extend their power or usefulness by that means instantly they will go out of existence."

The witness further testifying says:

"As to the statement of the witness J. C. McKinley that he thinks probably the first method of promoting the growth of the United Mine Workers is to ask the operators to compel the men to join the union," says he, "never heard

of· that before; that its policy is to go into a community where there is a mine and get acquainted with some of the men who work there, and talk to them about the organization, and get them interested in joining; and after a sufficient number could be gotten together to agree that it was a good thing to join the union, a meeting would be called to organize those men, just the same as any other fraternal society."

In this connection it should be borne in mind that the defendants as members of this organization cannot secure employment in any mine without first entering into an agreement with operators as to the terms upon which they are to work. In other words, it is optional with the operators as to whether they shall operate their mines, and further as to whether they shall employ union labor.

It is also insisted by the court below that under these rules the operator has no right to employ nonunion men even if he should desire to do so.

If the United Mine Workers of America in pursuance of this rule should resort to coercion, threats, intimidation, or violence for the purpose of preventing the mineowner from employing nonunion men, such conduct would be unlawful, and the courts would promptly restrain any one who might be a party to such transaction. Indeed, it would be unlawful for an individual to undertake, by coercion, intimidation, or threats to prevent a mineowner from exercising his own free will as to the employment of nonunion laborers, or as to any other thing which he might deem necessary to be done in order to protect his property rights.

However, in this instance, the plaintiff has adopted a policy by which only nonunion men may be employed. If the plaintiff may for the purpose of protecting its interests adopt a policy by which only nonunion men can secure employment at its mines, and such conduct be sanctioned by the law, by what process of reasoning can it be held that the defendants may not adopt the same method in order to protect their interests? If the plaintiff is to be protected in the use of such methods, and the defendants are to be restrained from using lawful methods for the purpose of successfully meeting the issue thus raised by the plaintiff, then indeed it may be truthfully said that capital receives greater protection at the hands of the courts than those through whose efforts capital in the first instance was created. But such is not the law, and when we consider the testimony as respects the conduct of the defendants, at and before the institution of this suit, we are of the opinion that the plaintiff has not by a preponderance of the evidence shown that these defendants employed unlawful methods as alleged in the bill.

At one time this identical mine employed union labor, and in all probability would have continued to do so, had it not been for a controversy which arose as to certain adjustments and the parties failing to reach an agreement the plaintiff decided to employ only nonunion labor.

It further appears that the plaintiff is paying the nonunion men the same wages that are being paid union men. Therefore, under these circumstances, is it not as reasonable to infer that the plaintiff is endeavoring to place the laborers of that section in a position where it

would be master of the situation, as it is to infer that the defendants are seeking to destroy the business of the plaintiff? While it is true that the plaintiff has a perfect right to refuse to employ union labor, is it not equally true that union labor, as we have stated, may by the employment of legitimate means do that which is necessary to keep its forces together?

Surely we have not reached the point when capital with its strong arm may adopt a plan like this for protecting its interests, while on the other hand the laboring classes are to be denied the protection of the law when they are attempting to assert rights that are just as important to their well-being as are the rights of those who have been more fortunate in accumulating wealth. He who "seeks equity must do equity." In other words, he "must come into court with clean hands." If the courts of this country should by injunctive relief protect the mineowner in the enjoyment of his property rights, and restrain the laboring people from organizing their forces by declaring such organization unlawful, would not the mineowner then be in a position to control the situation so that he who has to toil for his daily bread would be placed in a position where if he exists at all, he must do so at such wages, and upon such terms as organized capital may see fit to dictate? However, we do not wish to be understood as intimating that the plaintiff or a majority of those who employ labor in this country would take advantage of a situation of this kind for the purpose of oppressing those who are at their mercy. The instances where such a course is pursued are exceptional. Thousands of manufacturing plants all over the country, as well as railroad companies and mining companies, are to-day of their own accord employing union labor, realizing as they do that such a policy on their part is to the advantage of the employer as well as the employé. In fact, under our Constitution and laws, no undue advantages are given to either capital or labor, nor will the courts ever permit individuals or labor organizations by force, fraud, or intimidation to prevent the mineowner from lawfully protecting his rights; but, while this is true, equal protection should be guaranteed to labor and capital.

It was further held by the court below that under the rules of the organization the power is given to limit the right of the employer in the absence of contract to discharge whom he pleases, when he pleases, and for what he pleases. A careful examination of the constitution of the National, District, and Subdistrict organizations fails to disclose anything to justify this conclusion.

We have carefully examined the constitution to ascertain whether there can be found therein a rule or provision which authorizes the control of the employer's business by the organization, but find nothing to sustain this view, unless it be based on certain incidents in connection with the Hitchman Coal & Coke Company while it ran its mines union.

The witness McKinley, in speaking of the United Mine Workers, said:

"The term, a union mine, is one over which they have absolute control, and, a non union mine, one which is worked open shop, or in which the United Mine Workers are not recognized."

This statement as respects the extent to which the union assumes control over a union mine is flatly contradicted by the witness Savage, as well as by the testimony of Lewis and Sullivan. The witness Sullivan said:

"If the mine of the Hitchman Company had become unionized, the men would obey the management of the mine and not the orders of the union; they could not remain in the union and disobey the directions and orders of the operators, against the wishes of the union. There are no rules of the organization whereby a unionized mine must submit its men to the paramount control of the union, and I have never known any such rules to be adopted by the organization."

He further testified that one of the many purposes of the organization is to fix a fair scale of wages that should be uniform, so far as possible, taking into consideration the varied conditions existing in the different sections of the coal mining territory. It should be borne in mind that the scale of wages is fixed by agreement between operators and miners. Experience teaches us that the complaint of an individual is treated with indifference as compared to the complaint that is made by an organized body of men. When an individual makes a complaint, and it is refused, he must either quit work or submit to any terms that may be imposed upon him.

As a general rule employés of this kind possess but little property, owing to the fact that it requires the entire wages they earn to support their families from day to day. Under these circumstances they are unable to move from place to place to secure employment, and as a result they must accept such wages as may be offered.

Shutting down a mine by calling out men in obedience to their obligation is what is known as a "strike." Rule No. 10, which relates to strikes, is in the following language:

"No strikes shall take place at any time under the jurisdiction of subdistrict 5 of District 6, except for specific violation of agreement. That is, screens irregular; failure to pay on pay day without explanation; violation of mining laws by operators, or reductions from scale wages until the grievance of the mine affected has been thoroughly investigated by the officers of District 6, U. M. W. A. and operators interested. Any man or men that cause a stoppage of work at any mine in violation of this rule, shall be subject to dismissal at the will of the company."

This very clearly sets forth the causes wherein strikes are justifiable. The evidence in this case fails to show that these defendants have at any time tried by violence, intimidation, or fraud to induce the union men to quit working for the plaintiff.

A consideration of the purposes of this organization as set forth in its constitution impels us to the conclusion that there is nothing contained therein to justify the contention that its purposes are unlawful.

[3] As we have already stated, we are of the opinion that even if at common law, as originally adopted by the state of West Virginia, this organization was unlawful, it does not follow that that part of the common law is now applicable in that state, owing to the changed conditions to which we have referred. Nor do we find anything in the statute law of West Virginia to sustain the contention that this organization is illegal. The Code of 1906, enacted in 1890 (Acts 1890, c. 9, § 1) Code 1906, c. 15H, § 14, serial section 413, as amended in 1907

214 F.—45

(Acts 1907, c. 78, § 19 [Code 1913, c. 15H, § 28 (sec. 487)]), among other things provides:

"Nor shall any person or persons, or combination of persons, by force, threats, menaces, or intimidation of any kind, prevent or attempt to prevent from working in or about any mine, any person or persons who have the lawful right to work in or about the same, and who desires to so work; but this provision shall not be so construed as to prevent any two or more persons from associating together under the name of knights of labor, or any other name they may desire, for any lawful purpose, or for using moral suasion or lawful argument to induce any one not to work in or about any mine."

This statute provides a penalty for its violation. Code W. Va. Supp. 1909, § 413a1.

As amended it went into effect May 22, 1907, prior to the beginning of the institution of this suit, and this statute was enacted in 1890, the year in which the United Mine Workers of America were organized.

To say nothing of the legislative intent, the words of the foregoing statute by implication at least recognized labor unions. Referring to the use of labels or trade-marks by labor unions, etc., there appears in the Code of 1906, as section 1, c. 62e, serial section 2859 (Code 1913, c. 62E, § 1 [sec. 2859]), the following language:

"Whenever any person, firm or corporation, or any association or union of working men, has heretofore adopted or used, or shall hereafter adopt or use any label, trade-mark, term, design, or device or form of advertisement for the purpose of designating, making known, or distinguishing any goods, wares, merchandise, or other product of labor, as having been made, manufactured, * * * such person, firm, corporation or association or union of working men, or by a member or members of such association or union, and shall register the same as provided in section three of this act, it shall be unlawful to knowingly counterfeit or imitate such label, trade-mark, term, design, device or form of advertisement, or to knowingly use, sell, offer for sale, or in any way utter or circulate any counterfeit or imitation of any such label, trade-mark, term, design, device or form of advertisement."

The fact that the Legislature of that state enacted this statute, which has for its purpose the protection of labor unions in the use of what is known as a trade-mark, clearly indicates that the Legislature recognized labor unions as lawful.

In the case of Tracy v. Banker, 170 Mass. 270, 49 N. E. 308, 39 L. R. A. 508, the Supreme Court of that state uses the following language in regard to the effect of legislation of this kind:

"The label is part of the well-known machinery of trades unions, and the use of it is found, if a finding be necessary, to be of value to the union and its members. It would not be traveling too far from the record, perhaps, if we should assume that the use of the label is in fact, as certainly it might be, of far more economic importance to the union than are many or most of the trade-marks, strictly so-called, which are protected by the courts. * * *

"It is impossible to believe that when the statute mentions unincorporated unions it does not refer to trade unions. It authorizes such unions to adopt, as well as to record, a label. Therefore it creates a right, if the court is unable to recognize one without its aid. If it applies to trade unions, it must be taken to apply to them as they ordinarily are; that is, as associations of workmen, not as manufacturers or venders of goods. It contemplates that the labels would be applied to merchandise, as of course they must be, and as these labels are. * * *

"If, as we think, the statute expressly creates or recognizes the right of trade unions to be protected in the use of labels for trade union purposes, the

suggestion that the association represented by the plaintiff is an unlawful association falls of itself. It is too late to make such a contention as to trade unions generally, even apart from the statute under which this suit is brought. But the general purposes of this union are similar, so far as we know, to the general purposes of other unions."

In view of what we have said as to the status of these organizations at common law, and the further fact that there is an implied, if not direct, recognition of labor unions by statute in West Virginia, and there being no enactment declaring the same to be unlawful, we are of the opinion that the court below erred in declaring these organizations to be unlawful at common law.

At the final hearing the plaintiff introduced certain documentary evidence bearing upon the question as to whether the defendants had entered into a combination with operators and coal producers in Ohio, Western Pennsylvania, Illinois, and Indiana, competitive fields, to compel the plaintiff to submit to contractual relations with the United Mine Workers of America relating to the employment of labor and production, contrary to the wishes of plaintiff.

This evidence was offered in support of plaintiff's oral testimony, and consisted of the proceedings of the various joint conferences of coal operators and coal miners of the states in question, held during the years 1906, 1907, 1908, 1910, and 1911. Also, book entitled "Official Mining Scale of Association of Pittsburg Vein Operators of Ohio for their Mines in Belmont, Harrison and Jefferson Counties, Ohio, and the United Mine Workers of America." Also, book entitled "United Mine Workers of America, District No. 6, Ohio, Issued by the Authority of the Executive Board of District No. 6 (Ohio Members), United Mine Workers of America. G. W. Savage, Secretary-Treasurer. For scale year April 1, 1908, to March 31, 1910." Also, book entitled "Detailed Mining Scale for Subdistrict 5 of District 6, U. M. W. of A. Effective from April 1, 1910, to March 31, 1912." Also, "Excerpts from President T. L. Lewis' Report to the Twentieth Annual Convention of the United Mine Workers of America, held at Indianapolis, Indiana, in January, 1911, as published in the United Mine Workers Journal in its issue of January 19, 1911." Also, "Expenditures of the United Mine Workers of America for the year 1910." Also, "Income of the United Mine Workers for the year 1910."

Thirteen exhibits of this kind were introduced over the objections of counsel for defendants.

The court in referring to this phase of the question said:

"I further conclude that this Union, in pursuit of its unlawful purposes to secure control and the monopoly of mine labor, and to restrain, suppress, if not destroy, the coal mining industry of West Virginia in the interest of the co-conspirators, rival operators, and producers in Ohio, Western Pennsylvania, Illinois, and Indiana, competitive fields, have sought and still seek to compel the plaintiff, the Hitchman Coal & Coke Company, to submit to contractual relations with it as an organization, relating to the employment of labor and production contrary to the will and wish of said company; that its officers, in pursuance of such unlawful efforts to monopolize labor and restrain trade, and with knowledge of the express contracts existing between this plaintiff and its employés, have unlawfully sought to cause the breach of the said contracts on the part of its said employés."

[4] The documentary evidence consisted of the declarations of a small percentage of the miners and operators who were present at these conferences. It was not shown that either before or after these declarations were made that those participating in the conference had entered into a conspiracy for an unlawful purpose. Indeed, these declarations were brought out in response to a proposition on the part of the miners for an increase of wages. A fair interpretation of the evidence shows that it was the purpose of the defendants to induce the miners of West Virginia to become members of the organization, and thereby secure as high wages as possible, compatible with the successful operation of the mines of that state by the respective owners. They had a perfect right to form a combination to accomplish such purposes by peaceable and lawful methods, and so long as they refrained from resorting to unlawful measures to effectuate the same they could not be said to be engaged in a conspiracy to unionize plaintiff's mine.

As we have already stated, the evidence fails to show that any unlawful methods were resorted to by these defendants in this instance. Therefore the court erred in holding the organization to be unlawful upon the theory that it was guilty of a conspiracy.

The opinion of the court below is based upon the ground that the defendants, and those associated with them prior to and at the time of the institution of this suit, had formed themselves into a conspiracy for the purpose of unionizing the plaintiff's mines without its consent, and for violation of the constitution, common and statutory law of West Virginia.

[5] Chief Justice Fuller, in Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419, defined "conspiracy" as follows:

"A 'conspiracy' is * * * a combination of two or more persons, by concerted action, to accomplish a criminal or unlawful purpose, or some purpose not in itself criminal or unlawful, by criminal or unlawful means."

Being of the opinion that this is a lawful organization, it necessarily follows that, in order to entitle the plaintiff to the relief which it seeks, it must be made to appear that at, and before the institution of, this suit, the United Mine Workers of America were attempting to carry out the purposes of their organization by the use of unlawful means.

[6] Considerable evidence was introduced by the plaintiff as to what occurred in the vicinity of the plaintiff's mine.

Paul Leonard, superintendent of the Richland mine, was introduced, and among other things testified that he had met a man by the name of Thomas Hughes on the Richland Coal Company's property, and had had a talk with him in regard to the organization; that Hughes told him that it was his purpose to organize the Panhandle District of West Virginia. Among other things, the counsel put the following question to him:

"Q. What did you understand him to say his meaning was when he said that he was there to organize the Panhandle District? A. Why, that he would make them join the United Mine Workers or tie them up, were the words he used to me."

Counsel also asked him the following question:

"Q. Did he (meaning Hughes) make any explanation as to what he meant by tying up the Panhandle? A. That they would organize us and we would recognize the union."

The witness further says:

"My understanding of it was that if the company did not recognize this union that the mines would be shut down."

This was a threat by one who was without power to execute same. Nowhere do we find any evidence tending to show that Hughes was authorized to shut down any of the mines of that vicinity. It should also be remembered that Leonard further testified that Hughes said nothing about the plaintiff's mine.

[7] Austin, another witness for plaintiff, testified that he saw Hughes around there several times in the store and on the streets, and he also identified a card which was in the following language:

"Notice. To the Miners of the Hitchman mine: There will be a mass meeting Friday evening at 6:30 p. m., at Nick Heil's Baseball Grounds for the purpose of discussing the principles of organization. President Green will be present. All miners are cordially invited to attend."

These people, the defendants assert, had a right to hold a meeting at the baseball grounds for the purpose of discussing in an orderly manner the matters that related to their organization, and that this is especially true, inasmuch as the meeting was called for a lawful purpose, and the public generally invited to attend.

Witness Knapp also testified that he had taken down and carried away one of the notices that had been posted on a telephone pole; that Hughes had stopped him in the street, just as he was entering a private driveway, and said things to him that he did not suppose should be repeated in the presence of the court; that he attacked him very maliciously and vigorously, and was very mad.

We fail to understand upon what grounds the plaintiff or its agents claimed the right to prevent the defendants from holding meetings for the purpose of discussing matters relating to their organization.

Robert Myers was also introduced as a witness by the plaintiff, and, among other things, testified as follows:

"Q. Did you have any talk with a man by the name of Thomas Hughes? A. I remember him; yes, sir.

"Q. You remember a man by that name? A. Yes, sir.

"Q. What was he doing there—if he was about the Hitchman Mine—if you recall? A. Well, he explained to me that he was trying to organize the place again.

"Q. What is that? A. To organize the Hitchman coal miners again.

"Q. What do you mean by organizing? A. To get us organized—organized back into the United Mine Workers of America.

"Q. What did he say to you? A. Well, he said it would be very nice thing if we would go back again; and so he said if I would put my name down and give him 50 cents on a book (he did not show me the book, but said it had lots of names down on it of the Hitchman coal miners); he said if I would give him 50 cents I would be entitled to a union card to go any place and get a job, if the Hitchman company would fire me, and he would put my name down on his book.

"Q. Did you give him the 50 cents? A. No, sir.

"Q. What did you say to him on that subject? A. Well, I said I would

not do anything like this; he might be a stranger and I did not know that he was the man that he said he was, and, anyhow, I was awful careful in putting my name down to anything. He told me that he was a good friend of Mr. Koch, and that Mr. Koch had nothing against having the place organized again. He said he was a friend of his and I made the remark that I would ask Mr. Koch and see if it was so; and he said, no; that was of no use, because he was telling me the truth.

"Q. Did he show you any book? A. No, sir; I was trying to see the names on the book, but he would not show me anything. He told me he had it and I asked him how many names was on it, and he said he had about enough to 'crack off.'

"Q. What is that? A. That is what I didn't understand.

"Q. Did you ask him, what he meant by 'crack off'? A. The time was too short; no, sir. I was waiting for my street car to go home on and I went on the car.

"Q. Did you say anything to Hughes about the job that you then had at the Hitchman mine? A. Yes, sir.

"Q. Well, what did you say, if you can recollect? A. Well, I told him that I didn't care much about being organized again, because I had too much experience already how it goes. I told him I was in several strikes and there wasn't anybody that helped me out, and I had to beg the company to get my job back again after I lost my job.

"Q. Did you say anything to him about having any property? A. Yes, sir; I told him it was impossible for me to go any place else, because I could not walk around with my property on my back and hunt another job. I says, 'I have work where I am now, and, as long as the company treats me as they are treating me, I will not do anything against them that they didn't like to have.'"

## Mike Papage, another witness for the plaintiff, testified as follows:

"Q. What did he talk to you about? A. Oh, he tried to get me along with him to help him out so he could get the Hitchman mine organized again.

"Q. In what way did he ask you to help him? A. To help him to get the people together, and everything, and he was to pay me for it.

"Q. Were there at that time many men employed at the Hitchman mine who were foreigners? A. Yes, sir.

"Q. Did you speak their language? A. Yes, sir.

"Q. Could he speak their language? A. No, sir.

"Q. Did he want you to interpret—you understand what interpret means? A. Yes, sir.

"Q. Did he want you to interpret what he said to those men? A. Yes, sir.

"Q. Did you do it? A. No; I would tell him I won't do it.

"Q. Then what did he say? A. He got mad and went away.

"Q. After that did you see him any more? A. Yes, sir.

"Q. How did he treat you after that? I mean how did he treat you when you did not agree to interpret for him? A. Why, he came to my house—the second time he came to my house.

"Q. You mean he came to your house a second time? A. Yes, sir.

"Q. Then he had been there before? A. No; not before.

"Q. The second time you talked to him he came to your house. Is that the idea? A. Yes, sir.

"Q. Well, what did he say then? A. He tried to get me to interpret again, and promised me a good job and everything else.

"Q. Did that appeal to you then? Did you agree to do it then or not? A. No, sir; I would tell him I had nothing to do with him any more.

"Q. Why did you tell him that? A. They blamed me for not getting the men organized; they said it was my fault that the people kept on working.

"Q. And that Hughes could not organize the mine? A. Yes, sir.

"Q. Did Hughes tell you that? A. Yes, sir; he said that is what he heard off of the people.

"Q. That is, you mean, the men that were working in the mine. A. Yes, sir.

"Q. Did he tell you at any time how he was getting along? A. No.

"Q. Did he succeed in organizing the men there? Did he organize the men at the Hitchman mine? A. No.

"Q. Did the mine continue working while he was there? A. Yes, sir."

James Stewart, another witness for the plaintiff, testified as follows:

"Q. Were you about the Hitchman mine working there in the fall of 1907, when Thomas Hughes was there? A. Yes, sir.

"Q. Did you see Thomas Hughes there? A. Yes, sir; I saw him there several times.

"Q. Did you have any talk with him? A. Yes, sir; I talked with him several times.

"Q. Did you hear him talk with any other persons? A. He was around there all the time and he was talking to everybody he would come to.

"Q. To men employed at the Hitchman mine? A. Yes, sir.

"Q. Did he tell you what he was there for? A. Yes, sir.

"Q. What was it? A. He told me he was there to try to organize the mine.

"Q. Did he say what his business was? A. Yes, sir.

"Q. What was it? A. He said he was an organizer.

"Q. For what? A. For the United Mine Workers, and that he was there for that purpose. But I knew him before he came around there.

"Q. You did know him before that? A. Yes, sir.

"Q. What did he say to you, if anything, with relation to organizing the mine? A. I do not remember all that he did say, but I remember one certain thing that he said. He told me during one night that he was going to have a meeting called up there. I do not know what the date of it was, but it was in the latter part of August or first of September. He told me he had a couple of meetings there, but he did not seem to think it was any good; but he told me he was forming a kind of secret order among the men. He said he had a few men—he did not state the number of them—and he said each man was supposed to give him so much dues to keep it going; and then he said after he got the majority he would organize the place. He asked me what I had to say about it, and I told him my job at the present time was satisfactory and the men had agreed with the company not to organize and not to have anything to do with the organization, and I told him I did not want to have any trouble and nothing to say, anyway; and I think that was the last time I saw Hughes around there. I saw him after that across the river, but I didn't have any talk with him.

"Q. Did he say anything to you about quitting work at the Hitchman and going to a union mine? A. Yes, sir; he told me about it. He said he would get me a job, and I told him that might be all right about that, but I told him I did not think he could place me in any job any better than the one I had at the present time; and that is about as far as that went.

"Q. You say you remember of some meeting being held? A. Yes, sir.

"Q. What kind of a notice did he put out for the meetings? A. Well, I could not just say about the notices.

"Q. Did he mark on the pavements, or anything of that kind? A. Well, there was names around there, about meetings, but I do not know whether he wrote them, or who wrote them. I could not state just what was on them, but we miners claimed that that was what the purpose was.

"Q. Were there calls for meetings marked on the pavements? A. Yes, sir.

"Q. In chalk or some substance like that? A. It was in chalk.

"Q. White chalk? A. Yes, sir.

"Q. Was that done anywhere near the Hitchman mine? A. Well, the one I saw was right in front of Wilhelm's saloon, on the sidewalk.

"Q. Where is Wilhelm's saloon, with reference to the mine? A. It was about 150 yards north of the mine.

"Q. Did you attend any of the meetings that he held? A. No.

"Q. Did he say anything to you along the line of thought that unless you joined the union at that time, if the mine were unionized you would not get a job? A. Yes, sir; he stated to me that if we did not go in the local, or stay away from there and work where mines were organized, that we would

not ever be able to get a job in a union mine, but I have worked in two union mines since that, and had two union cards, and then came back to the Hitchman.

"Q. Did you hear him talk with others along the same line? A. Yes, sir; he talked with them all about the same, that I ever heard him talk to.

"Q. Did you hear him tell them that unless they joined then, that if the mine was organized they would be out of a job and they could not get any? A. He was talking to me and there was five or six or seven sitting there in a bunch, and they all heard just the same as I did about it.

"Q. Did he say what he was going to do with the men when he got enough to organize? A. Yes, sir.

"Q. What did he say he was going to do? A. He stated when he got a majority he was going to organize the mine. I expect the meaning of it was that he was going to organize whether it was against the company or not.

"Q. Did he say anything about shutting the mine down if they did not unionize it? A. He stated it that way—that whenever he got a majority he was going to organize or they would close the place down.

"Q. In point of fact, did he get a majority and unionize the mine or not? A. No, sir; I think he failed."

On cross-examination, this witness further said:

"Q. Well, then, while he was there he was trying to get men to join the union? A. Yes, sir.

"Q. And he invited you to join the union? A. Yes, sir.

"Q. And told you he thought it would be better for you to join, didn't he? A. Yes, sir; that is what he said.

"Q. And he said if you worked there and happened to be discharged, you could not get into a union mine? A. That is what he said.

"Q. His idea was that there were a great many more union mines across over in Ohio than there were nonunion, wasn't it? A. I expect that was what he meant.

"Q. Well, did he give you any further reasons why he thought it would be better for you to join the union? A. No; not just exactly."

The foregoing was substantially all the evidence that was introduced as to what occurred in the vicinity of plaintiff's mine prior to the institution of this suit, to show that the defendants had entered into a conspiracy as alleged.

While it is not denied by the defendants that they sought by peaceable methods to induce those employed by the plaintiff to join the union, yet they stoutly contend that at no time since the mine has been operated as a nonunion mine have they employed unlawful methods. We fail to find that there is sufficient legal evidence to show that the defendants entered into a conspiracy or combination for the purpose of unionizing the plaintiff's mine. While there was evidence admitted by the court below as to statements made by certain officials of the United Mine Workers of America, and the coal operators of Pennsylvania and other states, bearing upon this question, yet there is no evidence to show that the United Mine Workers of America combined, or formed themselves into a conspiracy for the purpose of unionizing plaintiff's mines after it started to run its mine nonunion in June, 1906.

The declarations of Hughes and Rankin are incompetent as against the organization, its officers and members, inasmuch as there is not sufficient legal evidence to establish the fact that the defendants as members of the United Mine Workers of America prior to and at the time of the institution of this suit formed a conspiracy; nor is there sufficient evidence to show that Rankin and Hughes were parties to such alleged conspiracy.

While Hughes was a representative of the organization, his authority only permitted him to use argument and persuasion to induce the employés to become members of the organization. This was shown by the evidence of the witness Savage.

A considerable portion of the evidence bearing upon the alleged unlawful conduct of the union in connection with the operation of the plaintiff's mine relates to the time that it was running its mine union, and the period intervening between the time it ceased operations at its mine until it resumed on a nonunion basis in June, 1906. For instance, the plaintiff complains of what happened during the strike which occurred when the mine employed union labor. Evidence was also introduced to show why the plaintiff did not continue to operate its mine on a union basis. This evidence shows that the real difference at that time was as to the price or scale to be paid for run of mine coal. While this evidence tends to show why the plaintiff declined to operate its mine on a union basis, it cannot have any material bearing upon the issues raised by the pleadings in this cause, and is therefore, as to matters now in controversy, a closed incident.

[8] Each party was at arm's length from that time on, and the refusal on the part of the plaintiff to continue the employment of union labor had the effect of severing the relations that had theretofore existed between the plaintiff and the defendants. Therefore evidence tending to show that prior to that date the defendants were engaged in a combination or conspiracy, and by intimidation, violence, and coercion were trying to prevent the plaintiff from operating its mine, would be incompetent. In other words, even though it appears from the evidence in question that the conduct of the defendants was reprehensible in the highest degree at the time that the mine was being run on a union basis, we conceive of no possible theory upon which such evidence would be competent as affecting the conduct of the defendants in this instance, inasmuch as the evidence fails to show that after the mine began to be operated on a nonunion basis that they united and conspired to use violence, intimidation, and coercion to prevent the plaintiff from operating its mine. In other words, this record clearly shows that the plaintiff for the avowed purpose of protecting its interests adopted a policy by which its mines were to be operated on a nonunion basis. At the time of the adoption of this policy by the plaintiff, the negotiations between plaintiff and defendants ceased, therefore the question now presented is: Have not the defendants the right as an organization to use all means within their power to organize miners into unions, provided that in so doing no unlawful methods are employed?

[9] The court below, among other things, expressed the view that the United Mine Workers of America constituted a combination or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, under what is known as the Sherman Anti-Trust Law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).

[10] We do not deem it necessary to discuss this proposition at any great length. In the first place, there is nothing in the pleadings to raise the question as to whether the United Mine Workers of America

are liable under the statute in question, and any evidence that may have been introduced bearing upon this point was therefore immaterial and should have been rejected. There is another reason why we think that this question cannot under any view of the case arise in this controversy, to wit, we do not understand that a private person can question the validity of a combination or conspiracy under the Sherman Anti-Trust Law for the purpose of having the same declared to be unlawful. The scope of this act is disclosed in the case of National Fire Proof Company v. Mason Builders' Association, 169 Fed. 259, 94 C. C. A. 535, 26 L. R. A. (N. S.) 148, in which the court said:

"But the complainant asserts that the agreement in this case is positively unlawful and not merely negatively invalid—that it contravenes both national and state statutes against combinations, and thus does give rights of action to injured persons. With respect to the federal statute, it is not obvious in what way a trade agreement between builders and bricklayers, relating to their work in the state of New York, can be said to directly affect interstate commerce; but the consideration of this question is not necessary because a person injured by a violation of the federal act cannot sue for an injunction under it. The injunctive remedy is available to the government only. An individual can only sue for threefold damages." Greer v. Stoller (C. C.) 77 Fed. 2.

Also, the case of Minnesota v. Northern Securities Co., 194 U. S. 48, 24 Sup. Ct. 598, 48 L. Ed. 870, is to the same effect.

[11] The court below also reached the conclusion that the defendants have caused and are attempting to cause the nonunion members employed by the plaintiff to break a contract which it has with the nonunion operators. The contract in question is in the following language:

"I am employed by and work for the Hitchman Coal & Coke Company with the express understanding that I am not a member of the United Mine Workers of America, and will not become so while an employé of the Hitchman Coal & Coke Company; that the Hitchman Coal & Coke Company is run nonunion and agrees with me that it will run nonunion while I am in its employ. If at any time while I am employed by the Hitchman Coal & Coke Company I want to become connected with the United Mine Workers of America, or any affiliated organization, I agree to withdraw from the employment of said company, and agree that while I am in the employ of that company that I will not make any efforts amongst its employés to bring about the unionizing of that mine against the company's wish. I have either read the above or heard the same read."

It will be observed that by the terms of the contract that either of the parties thereto may at will terminate the same, and while it is provided that so long as the employé continues to work for the plaintiff he shall not join this organization, nevertheless there is nothing in the contract which requires such employés to work for any fixed or definite period. If at any time after employment any of them should decide to join the defendant organization, the plaintiff could not under the contract recover damages for a breach of the same. In other words, the employés under this contract, if they deem proper may, at any moment join a labor union, and the only penalty provided therefor is that they cannot secure further employment from the plaintiff. Therefore, under this contract, if the nonunion men, or any of them, should see fit to join the United Mine Workers of America on account

of lawful and persuasive methods on the part of the defendants, and as a result of such action on their part were to be discharged by the plaintiff, it could not maintain an action against them on account of such conduct on their part. Such being the case, it would be unreasonable to hold that the action of the defendants would render the United Mine Workers of America liable in damages to. the plaintiff because they had employed lawful methods to induce the nonunion miners to become members of their organization.

Under these circumstances, we fail to see how this contract can be taken as a basis for restraining the defendants from using lawful methods for the purpose of inducing the parties to the contract to join the organization.

This is an age of co-operation through organization. In fact, organization is the only means by which united effort can be secured in any branch of human endeavor. The doctors, dentists, school teachers, wholesale and retail merchants, bankers, and manufacturers, and in fact every branch of industry in this country, are organized for the purpose of the mutual protection of the respective parties interested. Such being the case, it is just as essential, and perhaps more important, that the laboring people should organize for their advancement and protection, than it is for any of the vocations we have mentioned.

While labor and capital are vitally interested in the proper solution of these questions, it should be remembered that the public is likewise interested, and in some instances affected to a greater extent than either labor or capital on account of the disputes and lawsuits growing out of these matters. Therefore it may be properly said that these questions have a. bearing upon the welfare of a large percentage of our people, and this is especially true as respects the coal industry. For instance, the suspension of the operation of coal mining in this country would in all probability result in a coal famine, which would, in a large measure, embarrass the manufacturers, to say nothing of the effect it would have upon the individual consumer, and all reasonable means should be employed to avert such a disaster. Therefore we deem it our duty to define the rights of the parties to this controversy, in so far as we may under the facts of this case, so as to set at rest as many as possible of the vexatious questions that are a source of irritation, as well as productive of much litigation.

In the first place, it should be understood once and for all that, so long as capital employs legitimate means for the protection of property rights, it is to be accorded the protection of the law; but this does not mean that capital may, by improper methods, form combinations for the purpose of preventing labor from organizing for mutual protection. Likewise, it should be definitely understood that the laboring men have the right to use peaceable and lawful methods to unite their forces in order to improve their condition as respects their ability to earn a decent living; give their children moral and intellectual training; and secure the enactment of legislation requiring mineowners to adopt such methods as may be necessary to keep their mines in a sanitary condition, and, above all, to adopt methods to minimize, as much as possible, the occurrence of the awful catastrophes by which so many human lives have been lost. It should be understood that when a con-

troversy arises between labor and capital that the use of dynamite or any other unlawful methods on the part of the representatives of labor, whereby property and human lives are destroyed, is not to be tolerated by the courts.

The relative rights of the parties are entitled to equal consideration, and we feel sure that when such controversies arise that they will be dealt with in the same spirit that actuates the courts in adjusting the differences between individuals, wherein questions are involved affecting the ordinary transactions of life.

Until it is provided by state and national legislation that labor disputes shall be settled by arbitration, it will be the duty of the courts to determine questions of this character, when a proper case is presented. Under the law as it now exists, when property or personal rights are involved, the courts alone can furnish adequate relief. However, while this is true, we think that care and caution should be exercised in the issuance of injunctions of this character.

We are inclined to the belief that in some instances a reasonable delay in the issuance of the writ would have a tendency to bring about a settlement between the parties by which the rights of both could be amply protected, and thus avoid the expense incident to litigation, to say nothing about the injury sustained by the employer as well as the employé, occasioned by the suspension of operations.

In no instance should a union be restrained from using lawful and peaceable methods for the purpose of maintaining its organization; but, while this is true, the court should restrain those who by violence, coercion, and intimidation seek to deprive the mineowner of the right to use his property as he may see fit.

We have carefully considered the cases relied upon by the plaintiff, but are of opinion that they do not apply to the case at bar. For the reasons stated, the decree of the court below is reversed, and the cause remanded, with instructions to dismiss the bill at plaintiff's costs.

Reversed.